IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATE OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>JOSE CASTRO RIVAS,<br><br>　　　　　　　Defendants. | ORDER & MEMORANDUM DECISION<br><br><br><br>Case No. 2:05-CR-00231 TC |

　　　　On February 23, 2005, Jose Castro-Rivas was indicted on four charges of possession and distribution of a controlled substance and aiding and abetting in violation of 21 U.S.C. §§ 841(a)(1) and 2.  Mr. Castro-Rivas was also charged with possession of a firearm while illegally in the United States in violation of 18 U.S.C. § 922(g)(5).  This matter is before the court on Mr. Castro-Rivas' motion to suppress evidence allegedly obtained in violation of his Fourth Amendment Rights.

　　　　Officers arrested Mr. Castro-Rivas on March 16, 2005, relying primarily on information provided by an informant who had been arrested earlier that day on drug charges.  Mr. Castro-Rivas contends that officers did not possess sufficient probable cause to justify his arrest.  The court finds that the information provided by the informant was sufficiently corroborated to create probable cause to arrest Mr. Castro-Rivas and denies Mr. Castro-Rivas' motion.

# FACTS[1]

At about noon on March 16, 2005, Trooper Jeff Plank of the Utah Highway Patrol was called to investigate two people who had been arrested earlier for a drug violation following a routine traffic stop.  At that stop, officers had discovered a small amount of drugs and $3500 in cash.

Trooper Plank went directly to the Juab County Jail where he interviewed Americo Paniaguas-Campos, one of the people who had been arrested. Mr. Paniaguas-Campos spoke extensively with Trooper Plank about Mr. Castro-Rivas' drug operation.  Mr. Paniaguas-Campos was hoping for favorable treatment by the prosecutors of his case.   Trooper Plank told Mr. Paniaguas-Campos that he would speak to the prosecutor on Mr. Paniaguas-Campos' behalf if he fully cooperated in the investigation of Mr. Castro-Rivas.  Trooper Plank had never used Mr. Paniaguas-Campos as an informant before and did not know of any other officers that had.

Mr. Paniaguas-Campos told Trooper Plank a great deal about Defendant Jose Castro-Rivas' alleged drug operation.  He told Trooper Plank "that the money and the drugs that he had he'd earned . . . working for Jose Castro Rivas."  (Transcript of June 21, 2005 Evidentiary Hearing ("Tr.") at 6) Mr. Paniaguas-Campos told Trooper Plank that Mr. Castro-Rivas "was on his way back from Los Angeles, and that he should be bringing back in a hidden compartment possibly three [kilos] of cocaine and three [kilos] of heroin."  (Tr. at 7)   Mr. Paniaguas-Campos said that Mr. Castro-Rivas would likely return sometime that afternoon or evening and was driving "a maroon or red colored police type vehicle" with "round circular taillights."  (Id. at 8)

---

[1] Unless otherwise noted, all facts are derived from the court's June 21, 2005 Evidentiary Hearing on Mr. Castro-Rivas' motion to suppress.

According to Mr. Paniaguas-Campos, Mr. Castro-Rivas had two apartments in Salt Lake that "were both used to basically stash drugs and money. One of the apartments was basically a place where the runners could sleep at night." (Id. at 7) Mr. Paniaguas-Campos identified a man named "Abby" as one of the runners.

Mr. Paniaguas-Campos continued to help the officers in their investigation including identifying the two alleged stash houses. The first apartment identified by Mr. Paniaguas-Campos was located at 1185 West 3900 South, in the Fairway Apartments. Mr. Paniaguas-Campos told the officers that "[t]hat was the runners' apartment. Money and drugs were stashed there. And Mr. Paniaguas-Campos indicated that when Jose Castro was coming back with kilos, that's where they would break down . . . the larger amounts into distributable quantities." (Tr. at 10). While at the Fairway Apartments Mr. Paniaguas-Campos pointed out a car that he said belonged to "Abby." A license plate check identified Abisael Jimenez-Garcia as the registered owner.

The second apartment identified by Mr. Paniaguas-Campos was located at 1528 Santiago Lane, in the Santa Fe Apartments. Mr. Paniaguas-Campos told the officers that this apartment "was used for drugs and money, and specifically that Jose Castro lived in that apartment." (Tr. at 11-12) Mr. Paniaguas-Campos had told the officers that Mr. Castro-Rivas also owned a white Cadillac Escalade. While the officers were at the Santa Fe apartments the troopers saw the white Cadillac Escalade approximately forty yards from the apartment. The officers ran a computer check on the car and found that it was registered to "Jose C. Rivas." (Id. at 12) The computer check also revealed that the car was a Chevy Avalanche and not a Cadillac, although the car had been modified to look like a Cadillac Escalade.

At some point during the investigation Trooper Plank and Officer Leany asked Mr. Paniaguas-Campos to call Mr. Castro-Rivas. Mr. Paniaguas-Campos made a phone call to someone he claimed was Mr. Castro-Rivas. But the officers could never confirm, even after listening to a recording of the telephone call, that the person was, in fact, Mr. Castro-Rivas. Trooper Plank testified that he listened to a recording of the call immediately after it was made and: "It appeared to us that Jose Castro was mad at Paniaguas. Seemed like there was some type of conflict . . . ." (Tr. at 13) Mr. Castro-Rivas told Mr. Paniaguas-Campos to call "Abby" to take care of the problem.

Mr. Paniaguas-Campos made a second telephone call to a person he claimed was "Abby" at the Fairway Apartments. Trooper Plank again listened to a recording of the call immediately after it ended. Trooper Plank testified: "Rosendo Castro, who is the brother of Jose Castro, answered the telephone. And basically he had said that – he had asked Paniaguas to come to the apartment, and that Jose Castro would be there in a couple hours, and that at that point they would all talk about the problem that they had." (Tr. at 14)

Based on information from the investigation, officers from the Utah Major Crimes Task Force staked out the Fairway Apartments waiting for Mr. Castro-Rivas to arrive. During the surveillance, Mr. Paniaguas-Campos identified "Abby" and Rosendo Castro-Rivas coming and going from the apartment he had identified earlier. The man identified as "Abby" was also seen getting into a car that had been identified by Mr. Paniaguas-Campos. Officers verified that the car was registered to Abisael Jimenez-Garcia.

Trooper Plank testified that at about 11:30 p.m., a car matching the description given by Mr. Paniaguas-Campos entered the parking lot: "It was a police type vehicle. It was a maroon

Chevy Impala with the circular lights on the rear." (Tr. at 16)  Mr. Paniaguas-Campos said: "That's the car. That's him." (Tr. at 16).  A number of officers stopped the car at gun point.

Special Agent Tim Chard of Immigration and Customs Enforcement ("ICE") yelled "police" and ordered the driver, who was Mr. Castro-Rivas, out of the car.  Agent Chard testified: "I asked him to exit the vehicle.  And he sat there and had a soda in a large cup sitting on his lap.  And I asked him two or three times to exit the vehicle.  He did not, so I reached in and took the cup out of his hand and set it down on the ground, and grabbed his one arm and told him to exit the vehicle again." (Tr. at 31)  Again, Mr. Castro-Rivas did not do as ordered and Agent Chard testified that he then:

> Grabbed one arm and started requesting him to get out of the vehicle.  And I do remember when he was almost completely out of the vehicle and took his foot off the brake, [the car] started rolling forward towards my vehicle.  And I do remember him jumping back towards the vehicle and throwing it in park.  Then we brought him out of the vehicle.

(Tr. at 38)  Mr. Castro-Rivas then placed himself on the ground in a "spread eagle" position and was handcuffed.  "After he was . . . on the ground, handcuffs were placed on him for officer safety.  And . . . all weapons were re-holstered." (Id. at 39)

Agent Chard took Mr. Castro-Rivas' wallet from his back pocket while he lay on the ground and found an identification card in the name of Jose Castro-Rivas.  Mr. Castro-Rivas was then put in the back of a police car and Detective Leany talked to him.  Detective Leany told Mr. Castro-Rivas that the officers' believed he was traveling with a large amount of controlled substances and that they knew where his brother Rosendo and "Abby" were.  Mr. Castro-Rivas looked at Detective Leany and said: "Who told?" (Tr. at 68).  Detective Leany then read Mr. Castro-Rivas his rights according to Miranda v. Arizona, 384 U.S. 436 (1966).

During the detention of Mr. Castro-Rivas, Detective Lane Critser and his drug dog, Dano, were waiting nearby. Detective Critser testified that after Mr. Castro-Rivas was stopped he went to the scene with dog in tow.

Dano sniffed the outside of Mr. Castro-Rivas' car. Dano signaled that there were drugs "toward the rear of this vehicle, specifically where the bumper, rear bumper of the car was and the trunk latch where it comes down and the seam of the latch in the area of the license plate." (Tr. at 44) Detective Critser then let Dano into the trunk: "We opened the trunk and [Dano] sniffed the interior of the trunk . . . . And then he eventually moved over to where the trunk latch was . . . and began to scratch at that area right there." (Id. at 45) [O]fficers removed the license plate and found a compartment in the bumper of the car where several kilo-sized bundles of drugs were found.

At about the same time Detective Leany was speaking with Mr. Castro-Rivas in the police car, Agent Chard, Detective Orlando Ruiz and Detective Wolken went to the apartment in the Fairway Apartments that Mr. Paniaguas-Campos had identified as a stash house. The decision to go to the apartment was made before Mr. Castro-Rivas was stopped. Mr. Rosendo Castro-Rivas answered the door when the officers knocked. When Agent Chard identified himself in Spanish and asked if they could come inside, Mr. Rosendo Castro-Rivas invited them in. Mr. Rosendo Castro-Rivas told Agent Chard that someone was sleeping in the other room. Abisael Jiminez-Garcia came out of the bedroom.

Detective Ruiz told Mr. Jimenez-Garcia why they were there and that the officers had information that the apartment was being used as a stash house. Detective Ruiz asked if there were any drugs in the apartment. Mr. Jimenez-Garcia "shrugged his shoulders and he said he

didn't know." (Tr. at 51)  Officer Ruiz then asked "to look around for drugs" and Mr. Jimenez-Garcia responded: "Sure, I don't have nothing to hide."  (Id.)  The officers searched the apartment and found two ounces of heroin, two ounces of cocaine, "numerous drug paraphernalia, balloons, packaging material for distribution." (Id. at 52)

Mr. Jimenez-Garcia was arrested and spoke with the officers after waiving his Miranda rights.  Mr. Jimenez-Garcia told the officers "that Jose and Rosendo were letting him live at the apartment for free.  That Jose would pay him $400 a week to sell narcotics." (Tr. at 53)  Mr. Jimenez-Garcia also said that he believed Mr. Castro-Rivas kept larger quantities of narcotics at his other apartment near 7200 South, east of the freeway.

Detective Critser and Dano went to the Santa Fe apartments.  After doing his usual sniff test, Dano signaled the presence of drugs on the car that Mr. Paniaguas-Campos had identified as a Cadillac Escalade belonging to Mr. Castro-Rivas.  The officers got a search warrant for the Santa Fe apartment and found additional drugs.

## ANALYSIS

In his Motion to Suppress, Mr. Castro-Rivas argues that he was arrested without sufficient probable cause.  Specifically, Mr. Castro-Rivas contends that the officers' belief that he was committing a crime was based solely on insufficiently corroborated information provided by an inherently unreliable informant.  Accordingly, Mr. Castro-Rivas seeks suppression of all evidence discovered as a result of his arrest.[2]

---

[2] Mr. Castro-Rivas' argument is based upon the conclusion that he was arrested at the time of his stop and that he was not the subject of an investigatory detention.  The court believes that the circumstances of the stop may require only the reasonable suspicion necessary to justify an investigatory detention.  The Government's briefings on this matter, however, do not challenge Mr. Castro-Rivas' contention that this was an arrest.  The court recognizes that if the higher

**The Arrest of Mr. Castro-Rivas Was Made With Probable Cause Supported By The Corroborated Statements of a Police Informant.**

The arrest of Mr. Castro-Rivas was made without a warrant.  Probable cause to make a warrantless arrest exists when police have, at the moment of arrest, knowledge of facts and circumstances grounded in reasonably trustworthy information to warrant a belief by a prudent person that an offense is being committed by the person to be arrested.  Beck v. Ohio, 379 U.S. 89, 91 (1964); see also Wong Sun v. United States, 371 U.S. 471, 479 (1963); Brinegar v. United States, 338 U.S. 160, 175-76 (1949).

The probable cause required to justify a warrantless arrest is identical to the standard required to obtain a search warrant.  Probable cause can be based upon information from an independent source that can be independently corroborated.  Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975);  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000); see also United States v. Dawkins, 17 F.3d 399, 404 (D.C. Cir. 1994).  Probable cause exists as long as the probable "veracity" and "basis of knowledge" of persons supplying information and the results of independent police investigation make it reasonably likely, based on the totality of the circumstances, that the information is correct.  See Illinois v. Gates, 462 U.S. 213, 238 (1983).

Mr. Castro-Rivas argues that Mr. Paniaguas-Campos was inherently unreliable because of the circumstances under which he provided information to the investigating officers.  In support of this contention, Mr. Castro-Rivas cites to Lilly v. Virginia, 527 U.S. 116 (1999).  In Lilly, the Supreme Court found that statements of an accomplice were inherently unreliable when that

---

standard of probable cause is met, then reasonable suspicion to justify an investigatory detention is also met.  Accordingly, the court does not reach the issue of whether Mr. Castro-Rivas' detention was, in fact, an arrest.

informant was in custody at the time of his statements, made statements that, while incriminating himself, implicated another defendant, and sought to shift criminal liability to another individual. Lilly at 134-35 and 139. But Mr. Castro-Rivas' reliance on Lilly is misplaced. Lilly specifically addresses the inherent unreliability of an accomplice within the context of exceptions to the hearsay rule when an accomplice's statements are introduced at trial, not when such statements were made during an investigation of possible criminal activity. Here, the court examines whether the informant's statements were sufficiently corroborated to establish the likelihood that a defendant was committing a crime.

A determination of probable cause is based upon the totality of the circumstances, "including an informant's veracity and basis of knowledge." Danhauer, 229 F.3d at 1006; see also, Gates, 462 U.S. at 238. "When there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." Danhauer, 229 F.3d at 1006; see also United States v. Sturmoski, 971 F.2d 452, 457 (10th Cir. 1992); United States v. Artez, 389 F.3d 1006, 1111 ((10th Cir. 2004). An officer is not specifically required to corroborate an informant's information through personal observation in order to find probable cause. But an officer must have knowledge of "other matters that reasonably corroborate the informant's statements." United States v. Mathis, 357 F.3d 1200, 1204(10th Cir. 2004).

The degree to which statements must be corroborated has been examined extensively by the Tenth Circuit. For example, the court in United States v. Le, 173 F.3d 1258 (10th Cir. 1999), found sufficient probable cause based on information obtained from two confidential informants that the defendant was selling drugs from his home and kept weapons there. United States v. Le, 173 F.3d 1258, 1266 (10th Cir. 1999). The officers found drug residue in the defendant's garbage

and confirmed that the defendant was involved in the business of selling guns.  This information corroborated the informants' statements.  Id.; See also United States v. Sturmoski  971 F.2d 452, 457 (10th Cir. 1992) (Corroborated statements from informants who made statements against penal interest sufficient to find probable cause.); United States v. Williams, 605 F.2d 495 (10th Cir. 1979) (Probable cause found where informant was acquainted with defendant, knew where he lived, and reported seeing instruments of crime at defendant's home.  Officers provided a statement of past reliability and confirmed the defendant's address.).  But See United States v. Danhauer, 229 F.3d 1002, 1005-06 (10th Cir. 2000) (no probable cause where warrant affidavit contained "repetitive statement regarding the physical description of the Danhauer residence and the identity of the occupants" and statements regarding criminal histories.  Informant provided no basis for knowledge and the most serious allegations were not verified.)

      The Sixth Circuit's opinion in United States v. Rosario, 234 F.3d 347, (6th Cir. 2000), is instructive on the question of corroboration.  The court there found that an accomplice's statements implicating the defendant in a drug distribution conspiracy provided probable cause for a warrantless arrest, despite the lack of prior history as an informant and regardless of the fact that the accomplice provided information in order to reduce his own criminal liability.  Rosario, 234 F.3d at 350-51.  In Rosario law enforcement agents were able to corroborate a great deal of the information provided by accomplice before the arrest.  The accomplice's statements were corroborated repeatedly when events transpired as he said they would.  Id.  The court reiterated the words of the Supreme Court in Alabama v. White, 496 U.S. 325, 329 (1990), that when "an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity."

Here, like in Rosario, Mr. Paniaguas-Campos admitted he was involved in the sale of controlled substances with the defendant.  And Mr. Paniaguas-Campos provided information in the hope of receiving lenient treatment on the charges he was facing.  But Mr. Paniaguas-Campos provided substantial information that was corroborated by the investigating officers during the course of their investigation.  This information included the car Mr. Castro-Rivas was driving – a maroon "police-type vehicle" with circular taillights –  and that there were two apartments used as stash houses for the bulk of Mr. Castro-Rivas' drugs which were identified by Mr. Paniaguas-Campos.

Further, while at the two apartments identified by Mr. Paniaguas-Campos, the officers saw the white Cadillac Escalade that Mr. Paniaguas-Campos had told them about.  A computer check of the car revealed that it was registered to a "Jose C. Rivas."  At the Fairway Apartments, Mr. Paniaguas-Campos pointed out a vehicle that he said belonged to a drug runner named "Abby."  The computer check showed that the car was registered to a person named "Abisael."

While staking out the Fairway Apartments, Mr. Paniaguas-Campos pointed out Abisael Jimenez-Garcia and Rosendo Castro-Rivas coming and going from the previously identified apartments.  Mr. Paniaguas-Campos also made a phone call to Mr. Castro-Rivas.  The officers could not confirm that Mr. Paniaguas-Campos was actually speaking with Mr. Castro-Rivas, but they believed that he was and testified that Mr. Castro-Rivas sounded angry with Mr. Paniaguas-Campos.  At the direction of Mr. Castro-Rivas, Mr. Paniaguas-Campos attempted to call "Abby" but apparently spoke with Rosendo Castro-Rivas, the defendant's brother.  Rosendo Castro-Rivas told Mr. Paniaguas-Campos that Jose Castro-Rivas would be returning in a few hours and that he should come to the apartment to work the problems out.  This is consistent with the

information provided by Mr. Paniaguas-Campos regarding Jose Castro-Rivas' travel plans.

Mr. Paniaguas-Campos told officers that Mr. Castro-Rivas would be returning from Los Angeles that evening to the Fairway Apartments. While waiting at the apartments, Mr. Paniaguas-Campos identified Mr. Castro-Rivas as he entered the apartment parking complex in a car as identified earlier. This is consistent with what he had told officers throughout the investigation and also with the comments made by the Defendant's brother on the telephone.

Here, there was sufficient corroboration of Mr. Paniaguas-Campos' statements to create probable cause to justify the warrantless arrest of Mr. Castro-Rivas on the belief that he was transporting controlled substances.

Mr. Castro-Rivas does not specifically challenge the officers' justification for executing a "knock and talk" at the apartment located in the Fairway Apartments or the subsequent consent to search given by Abisael Jimenez-Garcia. The court notes, however, that the same facts which created probable cause to justify the warrantless arrest of Mr. Castro-Rivas also justify the officers inquiry at the apartment itself.

### The Affidavit Provided To Obtain The Warrant To Search The Apartment At Santiago Lane (The Santa Fe Apartments) Was Supported By Probable Cause.

Mr. Castro-Rivas asserts that the affidavit in support of the search warrant for the apartment located at Santiago Lane lacks probable cause because it consists of the inherently unreliable statements of the two informants (Mr. Paniaguas-Campos and Abisael Jimenez-Garcia) and of the statements made by Mr. Castro-Rivas after he had invoked his right to counsel. The court disagrees.

The government concedes that the identification of the apartment by Mr. Castro-Rivas

after he had invoked his right to counsel should be purged from the affidavit.  But even without this statement, there is sufficient information to create probable cause to search the apartment in question.  As noted above, the probable cause required to justify a warrantless arrest is identical to the standard required to obtain a proper warrant and may be based upon information from an independent source that can be independently corroborated.  Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975);  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000); see also United States v. Dawkins, 17 F.3d 399, 404 (D.C. Cir. 1994).  Accordingly, the discussion of the corroboration of Mr. Paniaguas-Campos' statements applies to the search warrant obtained to search the apartment he identified himself.  Additionally, Mr. Paniaguas-Campos' statements regarding Mr. Castro-Rivas' travel plans and the content of his car (i.e., the drugs found in the bumper) were corroborated during the arrest and lend further credibility to his information and contribute to a finding of probable cause.

## ORDER

Accordingly, Mr. Castro-Rivas' motion to suppress is DENIED.

DATED this 12th day of October, 2005.

BY THE COURT:

Tena Campbell

TENA CAMPBELL
United States District Judge